UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

J. JASON REYNOLDS,

Plaintiff,

v.

DIRECT FLOW MEDICAL, INC., et al.,

Defendants.

Case No. 17-cv-00204-KAW

**ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL**

Re: Dkt. No. 71

Plaintiff J. Jason Reynolds brings the instant putative class action against Defendants Direct Flow Medical, Inc. ("DFM"), Dan Lemaitre, John David Boyle, Gordon Bishop, Paul LaViolette, and Yuval Binur, alleging violations of various federal and California labor laws. (*See* First Amended Compl. ("FAC"), Dkt. No. 14.) Pending before the Court is Plaintiff's motion for preliminary approval of a settlement agreement between the parties. (Mot. for Prelim. App., Dkt. No. 71.) Upon consideration of the filings, as well as the arguments presented at the March 7, 2019 hearing, and for the reasons stated below, Plaintiff's motion for preliminary approval is GRANTED.

## I.    BACKGROUND

### A.    Factual Background

Defendant DFM is a medical technology company, who employed approximately 250 employees in California. (FAC ¶¶ 13, 15.) The individual Defendants were officers and/or members of the Board of Directors of Defendant DFM at the relevant times. (FAC ¶¶ 8-12.)

In 2016, Defendant DFM began negotiating with Haisco, a Chinese company, for a capital infusion of $100 million. (FAC ¶ 30.) On November 16, 2018, the financing arrangements collapsed. (FAC ¶ 33.) On November 18, 2016, Defendants furloughed the majority of their

workforce, including Plaintiff, and directed that such employees be placed on involuntary leave without pay. (FAC ¶ 22.) Defendants informed the employees that they were being furloughed due to lack of funding, but that they might eventually receive their unpaid wages. (FAC ¶ 24.) Defendants also told the employees that Defendants were contemplating layoffs, but that they might not necessarily lay off the entire workforce. (FAC ¶ 24.)

On November 30, 2016, Defendants terminated almost their entire workforce by e-mail. (FAC ¶ 25.) At the time of the termination, terminated employees were still owed unpaid wages, including unused personal time off ("PTO"). (FAC ¶ 26.) Terminated employees were also owed reimbursement for necessary business expenditures they had incurred, as well as salary increases that had begun accruing but had been deferred. (FAC ¶ 27.) Defendants acknowledged the unpaid wages, PTO, business expenses, and salary increases, but stated that they could not guarantee payment due to lack of funds. (FAC ¶¶ 26-27.) Plaintiff alleges that Defendants did not subsequently pay the wages, PTO, and business expenditures owed. (FAC ¶ 28.)

On January 9, 2017, Defendant DFM entered into a General Assignment for the Benefit of Creditors ("ABC"). (FAC ¶ 35.) "A California ABC is an essentially private, judicially-unsupervised process for liquidating insolvent debtors pursuant to specific statutory standards for commencing and conducting such proceedings set forth in California Code of Civil Procedure § 493.010." (Mot. for Prelim. Approval at 4.) On February 7, 2017, Defendants' employees were notified of the ABC, and were given a July 7, 2017 deadline to submit any claims against Defendant DFM's liquidated assets. (FAC ¶ 36.) Although Plaintiff and other employees submitted claims, none received any payments. (Mot. for Prelim. Approval at 4.)

**B. Procedural Background**

On January 13, 2017, Plaintiff filed the instant putative class action. (Dkt. No. 1.) On March 27, 2017, Plaintiff filed the operative complaint, alleging that Defendants' layoffs had violated both the Federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* ("federal WARN Act") and the California Worker Adjustment and Retraining Notification Act, California Labor Code § 1400, *et seq.* ("California WARN Act"). (FAC ¶¶ 53-67.) Plaintiff also seeks waiting time penalties under California Labor Code § 203 for failure to pay back wages

and unused PTO, as well as reimbursement for unpaid business expenses under California Labor Code § 2802. (FAC ¶¶ 68-82.) Finally, Plaintiff brings a claim under the Private Attorneys General Act, California Labor Code § 2698, *et seq.* ("PAGA") based on the § 203 and § 2802 violations. (FAC ¶ 93.)

In March 2018, the parties participated in mediation with Cynthia Remmers. (Tindall Decl. ¶ 6, Dkt. No. 71-1.) In preparation for the mediation, Defendant DFM provided information regarding Defendants' liability for the WARN Act violations, unpaid PTO, unreimbursed expenses, waiting time penalties, and retroactive pay increases. (Tindall Decl. ¶ 7.) After the mediation, the parties reached an agreement to resolve the case. (Tindall Decl. ¶ 6.)

On January 31, 2019, Plaintiff filed the instant motion for preliminary approval. On February 5, 2019, the Court issued an order requiring supplemental briefing on the motion for preliminary approval. (Feb. 5, 2019 Ord., Dkt. No. 72.) On February 20, 2019, Plaintiff filed his supplemental brief. (Supp. Brief, Dkt. No. 73.)

### C. Settlement Agreement

Under the terms of the settlement agreement ("Settlement"), Defendants agree to pay a "Gross Settlement Amount" of $911,500. (Tindall Decl., Exh. A ("Settlement Agreement") ¶ 1(m).) Separate from the Gross Settlement Amount, Defendants shall also pay the actual costs of settlement administration, which shall be no more than $12,000. (Settlement Agreement ¶ 6; Tindall Decl. ¶ 9.) Plaintiff's counsel intends to seek an award of 25% of the Gross Settlement Amount and the cost of settlement administration, or $230,875, as well as expenses currently estimated at $21,681. (Settlement Agreement ¶ 20; Tindall Decl. ¶¶ 24-25.) The Gross Settlement Amount also includes a $12,500 Class Representative Enhancement for the named Plaintiff. (Settlement Agreement ¶ 24.) Finally, the Gross Settlement Amount includes $13,672 in PAGA penalties; $10,254 shall be paid to the California Labor and Workforce Development Agency ("LWDA") and $3,418 will be part of the Net Settlement Amount for distribution to the participating class members. (Settlement Agreement ¶ 25.) This leaves an estimated Net Settlement Amount of $636,190.

A class member's share of the Settlement is calculated as two "Portions." (Settlement

Agreement ¶ 13.)  First, the settlement administrator calculates each class member's "Annualized Compensation Ratio" by dividing the individual class member's annual compensation by the total annual compensation of all class members.  The settlement administrator will then multiply the class member's "Annualized Compensation Ratio" by a figure representing 20% of the Net Settlement Amount to obtain "Portion 1" of the class member's settlement payment.  (Settlement Agreement ¶ 13.)

Second, the settlement administrator will add: (1) the dollar value of the individual class member's accrued but unpaid PTO as of November 30, 2016, (2) the amount of unreimbursed work expenses the class member incurred as of November 30, 2016, and (3) the amount of compensation the class member would have received as of November 30, 2016 from approved but deferred pay raises that the class member had not received.  (Settlement Agreement ¶ 14.)  The settlement administrator then divides this figure by the sum of these three figures for all class members to obtain the individual class member's "Unpaid Compensation & Expenses Ratio."  The class member's "Unpaid Compensation & Expenses Ratio" is then multiplied by a figure representing 80% of the Net Settlement Amount to obtain "Portion 2" of the class member's settlement payment.  If the class member has no unpaid PTO, unreimbursed expenses, or a deferred raise, the class member's Portion 2 will be zero.  (Settlement Agreement ¶ 14.)  All class members, however, will receive a settlement payment because all class members will have a Portion 1 amount.  (Mot. for Prelim. Approval at 8 n.3.)

Settlement payments are automatic, unless the class member opts out.  (Settlement Agreement ¶ 10.)  Within 21 days of preliminary approval, Defendants will provide the class members' identifying information and last known mailing and e-mail address to the Settlement Administrator, as well as information regarding the class member's annualized compensation, amount of unpaid PTO, amount of unreimbursed work expenses, and the amount of compensation a class member would have earned from deferred raises.  (Settlement Agreement ¶ 28.)  Within 30 days of preliminary approval, the Settlement Administrator will send all class members a Class Notice, which will notify each class member of their annualized compensation, amount of unpaid PTO, amount of unreimbursed work expenses, and amount of compensation the class member

would have earned from deferred raises.  (Settlement Agreement ¶ 30.)  The Settlement

Administrator will skip-trace returned or otherwise undeliverable Class Notices and re-mail within

two business days.  (Settlement Agreement ¶ 38.)  Class members will have 60 days from the date

of mailing to send objections, disputes, and/or opt-outs.  (Settlement Agreement ¶ 32.)  Once the

settlement receives final approval and all objections are resolved, the Settlement Administrator

shall mail settlement payments to the class members within 30 days.  (Settlement Agreement ¶¶

1(i), 8.)

The settlement is non-reversionary.  (Settlement Agreement ¶ 18.)  If the total amount of

the cashed settlement checks is less than 90% of the Net Settlement Fund, the uncashed amount

will be re-distributed to the participating class members on a pro rata basis.  (Settlement

Agreement ¶ 16(a).)  If the total amount of the cashed settlement checks exceeds 90% of the Net

Settlement Fund but is less than 100%, the remainder will be distributed to a *cy pres* recipient.

(Settlement Agreement ¶ 16(b).)  The parties have proposed California Human Development,

based in Santa Rosa, and Community Legal Aid SoCal, based in Orange County, as the *cy pres*

recipients, as both organizations focus on employee rights and are located in the areas where

Defendant DFM's facilities were located.  (Supp. Brief at 16-17.)

In exchange for the settlement payment, Plaintiff and class members release "all claims

that were asserted in the operative complaint or that could have been asserted based upon the

factual allegations set forth in the operative complaint."  (Settlement Agreement ¶ 49.)

## II.    LEGAL STANDARD

Per Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a certified

class may be settled, voluntarily dismissed, or compromised only with the court's approval."  The

purpose of requiring court approval "is to protect the unnamed members of the class from unjust

or unfair settlements affecting their rights."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th

Cir. 2008).  Thus, before approving a settlement, the Court must conclude that the settlement is

"fundamentally fair, adequate, and reasonable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026

(9th Cir. 1998).  This inquiry:

requires the district court to balance a number of factors: the

5

United States District Court
Northern District of California

> strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a government participant; and the reaction of the class members to the proposed settlement.

*Id.*; *see also Churchill Vill. L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (same).

Furthermore, the Ninth Circuit has recognized that where no class has been formally certified, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) ("when . . . the settlement takes place before formal class certification, settlement approval requires a 'higher standard of fairness'"). This more "exacting review" is required "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane*, 696 F.3d at 819 (internal quotation omitted); *see also Hanlon*, 150 F.3d at 1026 ("The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court[-]designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)").

When applying Rule 23(e), the courts use a two-step process for the approval of class action settlements. First, the Court decides whether the class action settlement deserves preliminary approval. Second, after notice is given to class members, the Court determines whether final approval is warranted. *See O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1121-22 (N.D. Cal. 2016). At the preliminary approval stage, courts in this district "have stated that the relevant inquiry is whether the settlement falls within the range of possible approval or within the range of reasonableness." *Cotter v. Lyft*, 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) (internal quotation omitted). "In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is plaintiff's expected

recovery balanced against the value of the settlement offer." *Id.*; *see also O'Connor*, 201 F. Supp. 3d at 1122. This determination "requires evaluating the relative strengths and weaknesses of the plaintiffs' case; it may be reasonable to settle a weak claim for relatively little, while it is not reasonable to settle a strong claim for the same amount." *Cotter*, 176 F. Supp. at 936 (citing *In re High-Tech Emp. Antitrust Litig.*, Case No: 11-cv-2509-LHK, 2014 WL 3917126, at *4 (N.D. Cal. Aug. 8, 2014).

In addition to considering whether the settlement falls within the range of reasonableness, courts in this district also consider whether the settlement: "(1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; [and] (3) does not improperly grant preferential treatment to class representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (internal quotation omitted). With respect to the level of scrutiny applied to this determination, "district courts often state or imply that scrutiny should be more lax." *Cotter*, 193 F. Supp. 3d at 1035-36. Several courts in this district have begun to question that "lax review" as "mak[ing] little practical sense." *Id.* at 1036. Instead, these courts suggest that "scrutinizing the agreement carefully at the initial stage and identifying any flaws that can be identified . . . allows the parties to decide how to respond to those flaws (whether by fixing them or opting not to settle) before they waste a great deal of time and money in the notice and opt-out process." *Id.*

## III. DISCUSSION

### A. Class Certification

Before determining the fairness of a class action settlement, the Court must as a threshold matter "ascertain whether the proposed settlement class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure applicable to all class actions, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Hanlon*, 150 F.3d at 1019. The Court must also find that at least one requirement of Rule 23(b) is satisfied. *Id.* at 1022.

The Court finds that for the purposes of approval of the class action settlement, the Rule 23(a) requirements are satisfied. First, numerosity exists because the settlement class includes over 200 individuals. (Mot. for Preliminary Approval at 20; *see also Ries v. Ariz. Beverages USA*

United States District Court
Northern District of California

*LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012) ("While there is no fixed number that satisfies the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not").)  Second, commonality exists because there are "questions of fact and law which are common to the class," as the claims are based on the termination of the class members on November 30, 2016 via a mass e-mail from Defendant Lemaitre.  Fed. R. Civ. P. 23(a)(2); *see also Hanlon*, 150 F.3d at 109-20 (noting that the commonality requirement is "permissive" and "has been construed permissively").  Third, typicality exists because the named Plaintiff suffered the same injury, based on the same facts, as the rest of the class, as Plaintiff was terminated on November 30, 2016 without prior notice and was not paid for his accrued but unused PTO, unreimbursed work-related expenses, and compensation related to a deferred raise.  *See Hanlon*, 150 F.3d at 1020.  Finally, adequacy exists because there is no evidence that Plaintiff and Plaintiff's counsel have any conflicts of interest with the proposed class, or that Plaintiff and Plaintiff's counsel will not vigorously prosecute the case on behalf of the class.  *See id.* ("Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?").

The Court also concludes that the Rule 23(b)(3) requirement is satisfied.  Under Rule 23(b)(3), the Court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Here, the Court finds that predominance is satisfied because Plaintiff's claims arise from Defendants' termination of the class on November 30, 2016, as well as the failure to pay compensation owed after their termination.  Further, the Court finds that superiority is satisfied because the alternative method to a class action likely involves "individual claims for a small amount of . . . damages," resulting in most cases involving "litigation costs [that] dwarf potential recovery."  *Hanlon*, 150 F.3d at 1023.

The Court therefore provisionally certifies the class for settlement purposes.

8

### B. Preliminary Approval Factors

#### i. Range of Reasonableness

In considering whether the Settlement Agreement falls within the range of possible approval, the Court "primarily consider[s] plaintiffs' expected recovery balanced against the value of the settlement offer." *Viceral v. Mistras Grp., Inc.*, Case No. 15-cv-2198-EMC, 2016 WL 5907869, at *7 (N.D. Cal. Oct. 11, 2016). Here, Plaintiff calculates the maximum WARN Act liability at $4,033,140, or the daily payroll of $67,219 x 60 days' notice. (Supp. Tindall Decl. ¶ 25, Dkt. No. 73-5.) Based on information provided by Defendants, Plaintiff calculates the unpaid PTO liability at $625,185, the retroactive pay increases at $109,141, and the unreimbursed expenses at $200,000. (Supp. Tindall Decl. ¶¶ 13, 26.) Plaintiff also calculates the maximum § 203 waiting time penalties at $2,016,570, or the daily payroll of $67,219 x 30 days. (Supp. Tindall Decl. ¶ 12.) Finally, Plaintiff estimates the PAGA penalties at $40,800. (Supp. Brief at 15.) In total, Defendants' liability is $6,984,036 for the non-PAGA claims and $7,024,836 for all claims.

The Gross Settlement Amount of $911,500 thus represents 13% of the total claims. Courts in this district have approved settlements with similar discounts, depending on the strength of the plaintiff's case and the risks in pursuing further litigation. *See Viceral*, 2016 WL 5907869, at *7 (approving case which represented 8.1% of the total verdict value). Here, Plaintiff identifies a number of significant risks that make the proposed settlement fall within a range of reasonableness.

##### a. Warn Act

With respect to the federal WARN Act claim, Plaintiff points to the WARN Act's "unforeseen business circumstances" exception, which excuses employers from providing 60 days' written notice of a plant closing or mass layoff "if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2). Here, Defendants could argue that the case falls within the "unforeseen business circumstances" exception because at the time Defendants would have been required to give notice, Defendant DFM was not facing an imminent shutdown as it was still

negotiating with Haisco for additional funding that would have allowed Defendant DFM to continue its operations. (Supp. Brief at 3.) It was not until mid-November that Haisco abruptly terminated negotiations and cancelled its proposed financing. (*Id.*) Thus, Defendants could argue that the breakdown of the financing agreement was unforeseeable, and that the failure to enter into the financing agreement directly caused the shutdown because Defendant DFM had no money to fund its operations. (*Id.*) Should the Court agree that the "unforeseen business circumstances" exception applied, Defendants would not be liable for violating the federal WARN Act. *See Angles v. Flexible Flyer Liquidating Trust*, 511 Fed. Appx. 369, 373 (5th Cir. 2013) (finding that the "unforeseen business circumstances" exception applied where the defendant's financers cut off all funding without warning, resulting in a shutdown).

Similarly, the California WARN Act has an exception to liability where the Employment Development Department determines that: (1) at the time that notice would have been required, the employer was actively seeking capital or business; (2) the capital or business sought would have allowed the employer to avoid or postpone termination; and (3) the employer reasonably and in good faith believed that giving notice of the layoffs would have precluded the employer from obtaining the capital or business sought. Cal. Labor Code § 1402.5(a). Defendant DFM has sought this exemption, although no determination has been made. (Supp. Brief at 4 n.3.) Again, Defendants could point to the fact that they were actively seeking capital from Haisco to avoid or postpone the terminations, and that they believed giving 60 days' notice of termination would have jeopardized their ability to obtain the capital. (*Id.* at 4.) Thus, there is a substantial risk that the Employment Development Department could determine that the exception applies, precluding liability under the California WARN Act.

Additionally, even assuming that Defendant DFM could be found liable for the WARN Act violations, Defendant DFM "is financially insolvent and effectively no longer exists as a corporate entity." (Mot. for Prelim. Approval at 14; *see also* Supp. Brief at 12.) Thus, Plaintiff would need to demonstrate liability as to the individual Defendants to obtain a monetary recovery. Plaintiff, however, identifies numerous risks for demonstrating individual liability. For example, the federal WARN Act imposes liability only on "employers" or "business enterprises," but

"several district courts have held that this definition does not include individual employers." *Carlberg v. Guam Indus. Servs.*, Civil Case No. 14-00002, 2016 WL 1180166, at *4 (D. Guam Mar. 25, 2016); *see also Cruz v. Robert Abbey, Inc.*, 778 F. Supp. 605, 608 (E.D.N.Y. 1991) ("A review of the statute, its applicable regulations and its legislative history indicate that 'employer' does not include individual persons."); *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc.*, 778 F. Supp. 297, 316 (E.D. La. 1991), *aff'd in part and rev'd in part on other grounds*, 15 F.3d 1275 (5th Cir. 1994) ("the language of the WARN Act . . . suggests that only business entities, not officers and directors of corporate employers, should be considered as employers under the Act").

As to individual liability under the California WARN Act, Plaintiff notes that he "has been unable to find a single case in which a court has interpreted this provision to find an individual officer or director . . . liable for a Cal-WARN violation." (Supp. Brief at 5.) While Plaintiff states that he could attempt to demonstrate alter ego liability, Plaintiff identifies risks there as well, explaining that he does not have substantial evidence to show that the individual Defendants held themselves out as liable for Defendant DFM's debts, or that Defendant DFM was a shell or conduit for the affairs of the individual Defendants. (*Id.* at 6.) Plaintiff also explains that there is a risk he may not demonstrate that there would be an inequitable result if the acts at issue are treated as those of the corporation alone, as Defendants could argue that they were sincerely trying to obtain funding to meet their financial obligations. *Compare with Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539-40 (2000) (finding no injustice where there was no evidence that fraud or deceptive intent led to the subsidiary's inability to meet its financial obligations).

In addition to risks as to liability, Plaintiff also points to the possibility of limited damages. While the WARN Act provides for damages up to 60 days' wages, Defendants could argue that they could not have known that a layoff was imminent until November 16, 2018, when Haisco informed Defendant DFM that it would not be moving forward with its investment. (Supp. Brief at 12.) Thus, Defendants could contend that they could only have provided two weeks of notice, limiting its liability to 23.3% (14 days/60 days) of the maximum liability. This would reduce the potential liability from $4,033.140 to $941,066. (*Id.*; *see also* Supp. Tindall Decl. ¶ 25.)

1       Thus, Plaintiff has identified substantial risks to finding WARN Act liability as to any

2   Defendant.  Defendant also identifies substantial risks to holding the individual Defendants liable,

3   which could preclude a financial recovery altogether due to Defendant DFM's financial

4   insolvency, as well as limits to the recoverable amount.

5           b.  Waiting Time Penalties, Unpaid PTO, Deferred Raises, and Unreimbursed
                Expenses
6

7       With respect to the remaining California Labor claims, Plaintiff primarily points to the risk

8   in demonstrating liability as to the individual Defendants.  Plaintiff explains he would rely on

9   Labor Code § 558.1, which provides that a person acting on behalf of an employer may be held

10  liable for particular labor violations.  (Supp. Brief at 7.)

11      On the facts, Plaintiff explains that there is evidence that Defendants LaViolette, Binur,

12  and Boyle may not have been directly involved in any of the alleged Labor Code violations.

13  (Supp. Brief at 8.)

14      On the law, Plaintiff observes that California Labor Code § 558.1 is a relatively recent

15  statute, and that the case law is still evolving.  (Supp. Brief at 8.)  In particular, Defendants have

16  argued that even if § 558.1 creates individual liability, the statute does not create a private right of

17  action for individual plaintiffs.  (*Id.*)  In support, Defendants could point to Labor Code § 558,

18  which predates and immediately precedes § 558.1 and which only authorizes the Labor

19  Commissioner to impose civil penalties.  (*Id.* at 9.)  Indeed, the California superior courts have

20  split on this issue.  *Sassani v. KLP Enters.*, Case No. CGC-17-557841, 2017 Cal. Super. LEXIS

21  2950, at *2 (Nov. 16, 2017) ("Labor Code 558.1 does not create a private right of action against a

22  director for an employer's violations of the Labor Code.  Nothing in the language or the legislative

23  history of section 558.1 states or suggests that it as intended to legislatively overrule the California

24  Supreme Court case law that corporate agents are not liable to employees for a corporate

25  employer's violations of the Labor Code.  As made clear in the legislative history, section 558.1

26  was intended to provide an additional avenue of recourse to the Labor Commissioner to enforce

27  judgments for Labor Code violations"); *Delfin v. ASD Estates, Inc.*, Case No. CIV537203, 2017

28  Cal. Super. LEXIS 8867, at *3 (May 2, 2017) (Labor Code §§ 558 and 558.1 . . . indicate that the

Labor Commissioner is authorized to take certain actions, and are silent as to any private right of action."); *Rangel v. RTI Props.*, Case No. BC641439, 2017 Cal. Super. LEXIS 8016, at *3 (May 3, 2017) ("section 558.1 states that an 'other person acting on behalf of an employer' may be liable for violations of other code sections of which there is undoubtedly a private right of action").

Given the substantial risks of finding any Defendants liable for the WARN Act violations, Defendant DFM's financial insolvency, and the unsettled case law of finding the individual Defendants liable for the remaining California Labor Code violations per § 558.1, the Court concludes that the discount, while significant, is warranted. Thus, the settlement falls within the range of reasonableness, and this factor weighs in favor of preliminary approval.

### ii. Serious, Informed Negotiations

Next, the Court considers how the parties arrived at the settlement, specifically whether the settlement was "the product of an arms-length, non-collusive, negotiated resolution." *Rodriguez v. W. Publ'g Co.*, 563 F.3d 948, 965 (9th Cir. 2009). Here, the parties' settlement was conducted after Defendants provided information necessary to calculating Defendants' potential liability. (Tindall Decl. ¶ 7; Supp. Tindall Decl. ¶¶ 12-13, 26.) The parties then attended mediation with Ms. Remmers, an experienced mediator of workplace claims. (Tindall Decl. ¶ 6, Exh. C.) Although the parties did not settle the case during the mediation, the parties followed up with multiple additional phone calls with Ms. Remmers, which ultimate result in an agreement in principal. (Tindall Decl. ¶ 6.) The Court finds that the parties reached the settlement via an arms-length, non-collusive, negotiated resolution, and that this factor weighs in favor of preliminary approval.

### iii. No Obvious Deficiencies

In its order for supplemental briefing, the Court raised concerns about the $12,500 Class Representative Enhancement requested. (Feb. 5, 2019 Ord. at 4.) Plaintiff has provided a declaration which estimates that he has spent between 154 and 221.5 hours on the litigation, as well as $1,200 in travel costs related to mediation. (Reynolds Decl. ¶ 15, Dkt. No. 73-1.) The Court reserves judgment as to the appropriateness of the Class Representative Enhancement for the final approval stage; at that point, Plaintiff should be prepared to cite to case law from this

District with comparable requests for Class Representative Enhancement fees.

The Court also required that Plaintiff address whether he submitted a copy of the settlement to the LWDA, and whether he had received any comments. (Feb. 5, 2019 Ord. at 3.) Plaintiff states that the settlement was submitted to the LWDA on February 1, 2019, and that no comments had been received. (Supp. Tindall Decl. ¶ 3.) At the hearing, Plaintiff confirmed no comments had been received. Likewise, the Court requested confirmation that the CAFA Notice had been sent, which has now been verified by Defendant. (Feb. 5, 2019 Ord. at 5; Gomes Decl. ¶ 2, Dkt. No. 73-2.)

The Court also required that the parties identify the *cy pres* recipients and explain how the recipients are related to the subject matter of the lawsuit and the class members. (Feb. 5, 2019 Ord. at 4.) The parties proposed two non-profit organizations that focus on the needs of unemployed workers in the locations where Defendant DFM's facilities were located. (Supp. Brief at 16.) Plaintiff also provides letters from each organization, explaining the services they provide. (Supp. Tindall Decl., Exhs. A, B.) The Court finds the proposed *cy pres* recipients appropriate.

Further, the Court requested changes to the Class Notice and procedures for speaking at the Final Approval hearing, which the parties have modified accordingly. (*See* Supp. Tindall Decl., Exh. D.) Plaintiff has also provided a copy of the "Class Member Information Form," which provides class members with information on their most recent salary, PTO, unreimbursed work expenses, and deferred pay increases based on Defendant DFM's records. (Supp. Tindall Decl., Exh. C.)

Finally, at the hearing, the Court asked the parties why the class members would only have 90 days to cash their checks, rather than the typical 180 days. The parties agreed to allow the class members 180 days to cash their checks.

The Court finds that the parties' changes have addressed the Court's remaining concerns, and thus this factor weighs in favor of preliminary approval.

### iv. Preferential Treatment

Finally, the Court considers whether the Settlement provides preferential treatment to any class members. The Court concludes that the Settlement does not. In its request for supplemental

briefing, the Court required Plaintiff to explain why a 20/80 ratio was chosen for the two Portions of each individual's settlement share. (Feb. 5, 2019 Ord. at 3.) Plaintiff explains that they believed the 20/80 ratio was fair in light of the relative likelihood of recovery on the WARN Act violations (Portion 1) versus the unpaid PTO, unreimbursed work expenses, and deferred raises (Portion 2). (Supp. Brief at 12.)

First, as explained above, Plaintiff estimates that the likely WARN Act liability would be $941,066, based on the date Haisco informed Defendant DFM that it would not be moving forward with the investment, thus leading to the layoffs. (Supp. Brief at 12.) Second, Plaintiff estimates that the total liability for unreimbursed expenses, unpaid PTO, deferred pay increases, and waiting time penalties was $2,950,896. (*Id.*) Thus, the WARN Act liability represents 24% of the non-PAGA liability, close to the 20/80 ratio chosen. Additionally, Plaintiff again points to the increased risks of holding any Defendant liable under the WARN Act given the "unforeseen business circumstances" exception, which would not apply to the remaining claims. (*Id.* at 12-13.)

Additionally, Plaintiff's counsel explains that in their conversations with more than two dozen class members, class members were more concerned with the claims for unreimbursed expenses, unpaid PTO, and deferred raises because they felt those claims represented wages and expenses they had already earned but had not been paid. (Supp. Tindall Decl. ¶ 11.)

Under these circumstances, the Court finds that the 20/80 ratio is reasonable and does not result in preferential treatment, but instead reflects the different values and risks associated with the various claims. This factor weighs in favor of preliminary approval.

### v. Notice Procedure

The Court has reviewed the content of the proposed notices, including the redline changes submitted with the parties' supplemental brief, and finds that they are adequate to inform the putative class of the terms of the Settlement Agreement and their ability to object and appear at the final approval hearing. Accordingly, the Court approves the revised proposed notice procedures.

### IV. CONCLUSION

The Court finds that based on the above factors, preliminary approval is warranted. The Court therefore GRANTS preliminary approval of the parties' proposed Settlement Agreement,

including the provisional certification of the class action. The Court APPOINTS, for settlement purposes only, J. Jason Reynolds as class representative, Steven M. Tindall of Gibbs Law Group LLP and John H. Douglas of Douglas Law Offices as class counsel, and CPT Group as Settlement Administrator. The Court APPROVES the revised notice provided by the parties, and sets the following schedule:

| Action: | Date: |
|---|---|
| Settlement Administrator to mail Class Notice | 30 days from the date of this order |
| Deadline for Class Members to opt-out and/or object to the Settlement Agreement | 60 days after mailing of Class Notice |
| Settlement Administrator to file affidavit attesting that notice was disseminated as ordered | 70 days after mailing of Class Notice |
| Plaintiffs to file Motion for Final Settlement Approval and Motion for Attorney's Fees, Costs, and Class Representative Enhancement | 35 days before the Final Approval Hearing |
| Reply in support of Motion for Final Settlement Approval and Motion for Attorney's Fees, Costs, and Class Representative Enhancement | 14 days before the Final Approval Hearing |
| Final Approval Hearing | August 29, 2019 at 1:30 P.M. |

IT IS SO ORDERED.

Dated: March 7, 2019

KANDIS A. WESTMORE
United States Magistrate Judge